# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| SCOTT DICKINSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil Action No.** |
| ) | **09-40149-FDS** |
| UMASS MEMORIAL MEDICAL ) | |
| GROUP, ) | |
| ) | |
| Defendant. ) | |

_____)

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO STRIKE AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a workplace discrimination action involving allegations of failure to accommodate a disability and unlawful retaliation. Plaintiff Scott Dickinson, proceeding *pro se*, was employed as a Division Administrator at defendant UMass Memorial Medical Group. He alleges that UMass Memorial failed to reasonably accommodate his learning disabilities and retaliated against him for disclosing those disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

Defendant has moved for summary judgment as to all claims. Plaintiff has moved to strike three exhibits submitted with defendant's summary judgment filings. For the following reasons, the motion to strike will be denied and the motion for summary judgment will be granted.

## I.    Background

The facts are presented in the light most favorable to the plaintiff, the non-moving party.

## A.    <u>Employment at UMass Before Revealing the Disability</u>

Scott Dickinson was hired by UMass Memorial Medical Center as a Division Administrator within the Department of Medicine on December 5, 2005. (Sampson Aff. ¶ 3). He was initially assigned to the gastroenterology division, which was headed by Dr. Dominic Nompleggi. (Nompleggi Aff. ¶¶ 1, 2, 4). In his capacity as a Division Administrator, Dickinson was responsible for his division's financial, operational, and general business functions. (Streeter Aff. ¶ 3, Ex. A). Some of his duties included developing and executing business plans, determining financial needs and budgets, and preparing financial reports. (Nompleggi Aff. ¶ 4).[1] Robert Elston-Pollock, a Senior Administrator, was Dickinson's direct supervisor. (Elston-Pollock Aff. ¶¶ 1, 2).

Dickinson's record of performance during the first ten months of his employment is mixed. Between December 2005 and July 2006, Elston-Pollock sent Dickinson several e-mails of encouragement and praise. (Pl.'s Opp., Ex. B). These e-mails included language such as "this is good," "good work," and "Scott, this is outstanding, keep it up." (*Id.*). Referring to a budget that Dickinson had created, Elston-Pollock wrote, "Scott, don't get a swelled head!" after another manager wrote, in reference to the budget, "Pretty good for the first time around. Impressed to say the least." (*Id.*).

Beginning in July of 2006, Dickinson's performance began to decline. E-mails from that period express concern over the accuracy of spreadsheets and financial documents produced by

---

[1] The "Position Description" for Division Administrator lists in detail the major responsibilities of the position. (*See* Streeter Aff., Ex. A). Some of these include working to increase the revenue of the department, preparing financial reports and budgets, performing analyses of billing activities and clinical productivity, monitoring billing revenue and expenditures, developing financial productivity forecasts, preparing data reports, and directing and supervising assigned personnel. (*Id.*).

Dickinson. (Elston-Pollock Aff. ¶ 4, Ex. A). In August 2006, Lynda Holmes, a senior accountant with whom Dickinson worked to prepare compensation plans and budgets, voiced concern over the integrity of his work product. (Holmes Aff. ¶¶ 2, 4, 5). She notified Elston-Pollock that Dickinson's formulas were incorrect, observing that he "doesn't seem to have an understanding of even the basics." (*Id.* ¶ 5, Ex. A). Later, in October, she again expressed frustration to Elston-Pollock over Dickinson's misunderstanding of compensation formulas and his failure to learn or take notes when she instructed him on how to perform the calculations. (*Id.* ¶ 6, Ex. B).

Other e-mails from the summer of 2006 suggest that Dickinson's performance was sub-par. One e-mail instructs Dickinson, "you need to be hear [sic] at 9 sharp and leave at 5 at the earliest," as Elston-Pollock was "getting flak" about his tardiness. (Elston-Pollock Aff. ¶ 4, Ex. A). In September, Elston-Pollack wrote to Dickinson alerting him that Dr. Nompleggi was "complaining" about him. (*Id.*). Dickinson had on several occasions made the same mistake in classifying doctors in a budget spreadsheet, and Dr. Nompleggi had expressed frustration to Elston-Pollock over this error. (Nompleggi Aff. ¶¶ 6, 7, Ex. B).

On October 12, Elston-Pollock wrote to inform Dickinson that he would not be permitted to attend an upcoming professional conference in Las Vegas. (*Id.*). Because a site visit was approaching and he was "struggling with some of the financial fundamentals," Elston-Pollack wanted him to remain behind to improve his competency. (*See id.*).

### B. Notice of Plaintiff's Disability and Accommodations

The following day, on October 13, Dickinson scheduled an appointment with Jeanne Sampson, a partner in the human resources department. (Sampson Aff. ¶ 5). During the meeting, he revealed that he had been diagnosed with dyslexia and attention deficit disorder in 2001. (*Id.*).

He provided a doctor's note to verify the claim. (*Id.*). Dickinson explained that he had not previously disclosed these learning disabilities to his supervisors or members of the human resources team. (Sampson Aff. ¶ 5; Elston Pollock Aff. ¶ 3). He also mentioned that he had not asked for assistance to accommodate his disability. (Sampson Aff. ¶ 5; Elston Pollock Aff. ¶ 3).

Sampson forwarded the doctor's note to UMass Memorial's Employee Health Services Department, which recommended that Dickinson undergo an updated assessment. (Sampson Aff. ¶ 6). In the meantime, Sampson, Elston-Pollock, and Dickinson met to discuss accommodations that could begin right away. (*Id.* ¶ 7). All three agreed that Dickinson should attend an Excel class to bolster his understanding of the financial documents, analyses, and formulas with which he worked. (*Id.* ¶ 8). UMass Memorial eventually sent him to a course on the topic; Dickinson reported that it was "good" and planned to refer to the workbook it provided if he had difficulties with Excel in the future. (*Id.* ¶ 13).

In November 2006, UMass Memorial received an updated assessment of Dickinson from Dr. Charles Carl. (*Id.* ¶ 9, Ex. A). The updated assessment confirmed the 2001 diagnosis of attention deficit disorder and dyslexia. (*Id.*). Dr. Carl's letter suggested the following workplace accommodations for Dickinson: (1) additional training time when learning new information or tasks, (2) refresher training as needed (possibly including presentation of information through more than one medium), (3) use of a large screen display calculator, (4) access to an outline or narrative to assist in understanding formulas and calculations in complex spreadsheets, (5) reduction in excessive noise and other distractions in the work environment, and (6) "feedback/guidance on a weekly basis to help with prioritization of tasks, communication of job performance, and clarity on issues/tasks that are unclear." (*Id.* ¶ 9, Ex. A).

Dickinson met with Sampson, Elston-Pollock, and a member of the Employee Health Services Department on December 7 to discuss these suggested accommodations. (*Id.* ¶ 10). UMass Memorial agreed to implement each of the recommendations, with the exception of presentation of information through more than one medium. (*Id.*). Up to that point, information had been presented in verbal and written formats, and no one at the meeting could think of an alternate format that would strengthen comprehension and communication. (*Id.*).

As to the first accommodation, UMass maintains that Dickinson was not assigned new tasks or given new information that required additional training time after implementation of the accommodations. (*Id.* ¶ 11). The second and fourth accommodations were fulfilled through the Excel course that UMass provided for Dickinson. (*Id.* ¶ 12). The third accommodation was already implemented at the time the recommendations were made. (*See id.*, Ex. A). The provision of a semi-private office for Dickinson—he occasionally shared it with a part-time nurse—was intended to reduce noise and distraction in furtherance of the fifth accommodation. (*Id.* ¶ 14).

The parties dispute the extent to which Elston-Pollack provided Dickinson with guidance and feedback in compliance with the sixth accommodation. Elston-Pollock maintains that he often met with Dickinson multiple times a day to provide feedback and guidance, either in person, by telephone, or by e-mail. (Elston-Pollock Dep. at 109). At a minimum, the two always met weekly. (Elston-Pollock Dep. at 109; Sampson Aff. ¶ 15). In addition, Dickinson's office was closer to Elston-Pollock's than were the offices of most other administrators, managers, or supervisors. (Elston-Pollock Dep. at 109). Elston-Pollock asserts that because of this, he was readily available to Dickinson for further guidance. (*See id.*). Dickinson did not express

dissatisfaction with the amount of supervisory feedback he received from Elston-Pollack until early May 2007. (Sampson Aff. ¶ 15, Ex. B). As chief of the gastroenterology division, Dr. Nompleggi also met with him on a weekly basis to discuss ongoing tasks. (Nompleggi Aff. ¶ 6).

Dickinson maintains that at some point, Elston-Pollock stopped conducting formal weekly meetings with him. (Pl.'s Facts at 4). The only evidence of this claim is a May 3 memorandum from Dickinson to Elston-Pollock in which Dickinson first expressed dissatisfaction with the frequency of the meetings. (Sampson Aff., Ex. B).[2]  Dickinson does not dispute the frequency of his meetings with Dr. Nompleggi.

### C.    Performance After Accommodations Were Instituted

Dickinson's informal performance evaluations did not improve after the accommodations were implemented.  E-mails from other division members in December 2006 expressed concern over his "lack of interest [and] enthusiasm" and indicated that they were "not real comfortable" with Dickinson assuming additional responsibilities. (Elston-Pollock Aff. ¶ 7, Ex. B). Other e-mails expressed frustration that his work product didn't make sense. (*See id.*).

Memoranda and e-mails from February and March 2007 further documented inaccuracies in Dickinson's spreadsheets and analyses. (*See id.*). One e-mail from Elston-Pollock urged him to "be more detailed in [his] forecasts"; another told him that a compensation plan spreadsheet he prepared "is all wrong." (*Id.*). In separate memorandum, Elston-Pollock recounted that

---

[2]  In the memorandum, Dickinson wrote, "It is my belief that the[] accommodations are not being met as we are not meeting on a weekly basis to review my performance in order for me to enhance any performance issues that you feel I have.  If we had met on a weekly basis in a positive proactive environment I feel that no concerns would have been raised during this evaluation period." (Sampson Aff., Ex. B).

In his opposition filings, Dickinson has also included a section of a Procedures Manual that details UMass Memorial's Discipline Policy. (Pl.'s Opp., Ex. A). This policy governs the disciplinary process, but does not address norms for providing supervisory feedback.

Dickinson was not aware that the gastroenterology division was earning a profit; he had believed mistakenly that the division was in deficit. (*See id.*).

In February 2007, Dr. Nompleggi received complaints about Dickinson's treatment of subordinate employees. (Elston-Pollock Aff. ¶ 8; Nompleggi Aff. ¶ 9). In response, Sampson conducted an investigation into Dickinson's behavior. (Sampson Aff. ¶¶ 18, 19). Employees in the Department of Medicine generally raised concerns about an intimidating and negative atmosphere fostered by Dickinson. (*Id.* ¶ 19, Ex. C). Specifically, he had commented that he had "fired employees before in [his] past job and [had] no problem doing [it] again," and made negative comments to staff members when stopping by their offices. (Sampson Aff., Ex. C). The employees reported that they "felt [a] threat to their jobs and didn't know what to expect." (*Id.*). As a result, many sought employment outside the Department of Medicine. (*Id.*).

Sampson and Dr. Nompleggi met with Dickinson after the investigation was completed. (*Id.* ¶ 20). They offered him several recommendations for improving his management style, including (1) showing appreciation and concern for employees and recognizing their good work, (2) making suggestions for improvement in a constructive, positive manner, (3) taking seriously issues that arise, (4) administering necessary disciplinary actions in a firm, non-threatening manner, and (5) encouraging an open, positive atmosphere in staff meetings and office visits. (Sampson Aff. ¶ 20, Ex. D). Dr. Nompleggi told Dickinson that he expected to see improvement in these areas. (*Id.* ¶ 20). According to Dr. Nompleggi, by this time, other members of the division advised him that they had "lost faith in Mr. Dickinson's ability to support the [d]ivision." (Nompleggi Aff. ¶ 13).

In April 2007, Dickinson e-mailed a question to Michele Streeter, who was at the time the Vice President of Finance and Administration. In response, she forwarded the e-mail to Elston-Pollock, writing, "This is ridiculous. Have you documented his performance?" (Elston-Pollock Aff. ¶ 7, Ex. B). Elston-Pollock forwarded her response to Dickinson, writing, "We need to talk[.] You are making yourself look stupid[.] Why would you e-mail a [Vice President] with a question like this?" (*Id.*). Subsequent e-mails from Elston-Pollock to Dickinson critiqued his failure to use a standard template in a form letter and referred to a document he produced as "confusing." (*Id.*).[3]

### D. Assignment to Rheumatology Division and Pay Structure

In December 2006, around the same time that Dickinson and his supervisors agreed to accommodations for his learning disabilities, he was assigned duties in the rheumatology division in addition to his duties in the gastroenterology division. (Dickinson Dep., Feb. 12, 2010, at 12-13). There is no evidence in the record concerning how this reassignment of responsibilities affected his workload or responsibilities.

---

[3] In his memorandum opposing summary judgment, Dickinson contends that he has presented evidence that Michele Streeter and another senior executive wanted to "get rid of [him]." In support of that claim, he attached a portion of a transcript that he represents was a deposition of Jeanne Sampson in a prior MCAD proceeding. (*See* Pl.'s Opp, Ex. B). The relevant portion of the transcript reads as follows:

Q: So at the time of the grievance, you had known for almost a year that Michele Streeter, according to Robert Elston-Pollock, wanted to get rid of Mr. Dickinson; right?

A. I have to disagree with that. Although it was stated to me at that time, it was [Elston-Pollock] stating it to me. It was not Michele. I never heard from Michele anything about wanting to get rid of Mr. Dickinson. It never came up again and it was almost a year later that the grievance took place.

Far from representing that Streeter wanted to get rid of Dickinson, the transcript actually indicates that Sampson did not believe that Streeter wanted to get rid of him.

8

According to Dickinson, he should have received additional compensation after the reassignment because "other administrators have received higher compensation for taking on additional divisions." (*Id.* at 13). His deposition testimony asserted that employees are entitled to additional compensation when they move to a higher job grade. (*Id.*). Dickinson then admitted that nothing in his personnel file shows that he did move to a higher job grade when he took on responsibilities for the rheumatology division. (*See id.*). Nevertheless, he insisted that he was assigned to a higher job grade by virtue of taking on responsibilities for a second division. (*See id.*).

UMass Memorial has submitted copies of the job descriptions for Dickinson's position, Division Administrator, and for the position one grade above Division Administrator, Senior Division Administrator. (*See* Streeter Aff., Ex. A, B). The responsibilities differ for the two positions. (*See id.*). It has also submitted its "Salary Adjustments Resulting from Grade Changes" policy, which governs promotions, grade changes, and compensation increases. (Streeter Aff. ¶ 7, Ex. C). In relevant part, that policy provides, "When an employee is assigned to perform the responsibilities of a higher graded position on a temporary basis, a temporary promotional pay increase is normally given to the employee for the duration of the assignment." (*Id.*).

In reference to this policy, Michele Streeter's affidavit asserts, "Whether an individual was given the title and corresponding pay of a [Senior Division Administrator] depended on the individual's work experience and their level of responsibilities within their respective divisions. It was not simply dependent on whether an individual supported more than one division. . . . [A] Division Administrator that handled responsibilities in two divisions would not be considered

'perform[ing] the responsibilities of a higher graded position' for the purposes of this policy."

(Streeter Aff. ¶¶ 6, 8, Ex. C).

### E.     Department of Medicine Restructuring and Dickinson's Job Application

The Department of Medicine announced plans to undergo organizational restructuring in February 2007. (Pl.'s Opp., Ex. D). The position of Division Administrator was to be split into two positions: Division Manager and Division Supervisor. The Division Manager, a higher-level position than Division Administrator, would be responsible for planning the budget, handling physician compensation, and engaging in strategic planning. (Pl.'s Opp, Ex. D). The qualifications for the position were set forth in an announcement as follows:

> Demonstrated ability to lead and direct a project team and conduct effective meetings and work sessions required. At least six to ten years of proven project management, professional, administrative, supervisory or management experience required . . . . Must have outstanding interpersonal skills, both oral and written.

(Elston-Pollock Aff. ¶ 11, Ex. C). The Division Supervisor, a position on par with the old Division Administrator position, would handle divisional operations. (Pl.'s Opp, Ex. D).

Dickinson submitted an application to Elston-Pollock for both the Division Manager and the Division Supervisor positions. (Elston-Pollock Aff. ¶¶ 12, 13). After considering Dickinson's record of performance, Elston-Pollock determined that he was not qualified for a promotion to the Division Manager role. (Id. ¶ 12). He told Dickinson about this decision on March 19. (Id.). In an e-mail to a human resources representative, Elston-Pollock recounted the conversation as follows: "I told Scott I would not consider him for [the role of Division Manager] based on his lack of experience, difficulty managing faculty compensation plans and his still to be developed interpersonal skills." (Id. ¶ 12, Ex. D). According to Dickinson, Elston-Pollock told him that he

"looked like an idiot for applying for the manager position." (Dickinson Dep., Feb. 12, 2010, at 14).[4] Elston-Pollock eventually hired Dickinson for the Division Supervisor position. (Elston–Pollock Aff. ¶¶ 13, 14).[5]

### F.    April 2007 Pay Raise and May 2007 Performance Evaluation

In April 2007, Elston-Pollock allocated pay raises to the employees under his supervision. He could have given employees up to a 4% pay raise. (Nompleggi Aff., Ex. E). The percentage raise was intended to provide performance feedback; 0% indicated very poor performance, 2% meant "needs improvement," 3% meant "meets expectations," and 4% meant "exceeds expectations." (*Id.*). Elston-Pollock asked for Dr. Nompleggi's input on what pay raise Dickinson should receive. (Nompleggi Aff. ¶ 14). In light of Dickinson's poor performance, Dr. Nompleggi recommended that he not receive any pay raise. (*Id.* ¶ 15). Nevertheless, Elston-Pollock decided to give him a 2.5% pay raise. (*Id.*).

Elston-Pollock completed Dickinson's 2007 performance evaluation in April and gave it to him on May 3. (Elston Pollock Aff. ¶ 17). It rated his overall performance as "needs improvement." (*Id.* ¶ 16, Ex. G). It detailed a number of his "performance gaps," including (1) his failure to report on the gastroenterology division's profitability in a division-wide meeting; (2) an e-mail to a senior executive in the Department of Medicine that "damaged [Dickinson's]

---

[4] Dickinson also testified in his deposition that he saw an e-mail from Elston-Pollock to Streeter in which Elston-Pollock referred to him as an "idiot." (*See* Dickinson Dep., Feb. 12, 2010, at 12-13). He could not remember the date of the e-mail, but stated that he didn't find out about it until it was disclosed during discovery. (*Id.*). As far as the Court can tell, that e-mail is not a part of the summary judgment record, so there is no information concerning the context in which it was written.

[5] Maureen Bresee-Ferreira was hired for the Division Manager position to which Dickinson applied. (Elston-Pollock Aff. ¶ 15). The parties have submitted copies of her resume and of Dickinson's resume. (*See id.*, Ex. E, F). Elston-Pollock testified that she was "much more qualified" than Dickinson for the position. (*Id.* ¶ 15). Dickinson disputes that she was more qualified for the position.

credibility" and "put [him] in an unsophisticated and unfavorable light"; (3) staff complaints concerning Dickinson's management style; and (4) his "difficulty analyzing situations beyond the task at hand"—specifically referring to an incident where Dickinson failed to convey a detail about salary to a member of the senior management. (*Id.*). In reference to the fourth performance gap, Elston-Pollock wrote that Dickinson had "put [him]self in a less than desirable position (i.e. looking foolish) with senior management." (*Id.*). The review noted, "There is a growing feeling amongst many in the Department, myself included, that you are overwhelmed by the duties of this position and have difficulty problem solving." (*Id.*). Elston-Pollock closed the evaluation by commending Dickinson's admirable qualities and noting that he believes the Division Supervisor position will help "capitalize on [Dickinson's] strong points and help [him] develop [his] talents so that [he] will become a strong Manager in the Department in the future." (*Id.*).

Dickinson drafted a memorandum that same day in response to the performance evaluation and sent it to Elston-Pollock. (Sampson Aff., Ex. B). It sought to explain the circumstances surrounding the performance critiques and expressed dissatisfaction with the frequency of meetings with Elston-Pollock. (*See id.*). Dickinson noted his surprise at not receiving credit in the evaluation for his assumption of responsibilities in the rheumatology division. (*Id.*). He also expressed surprise that the performance evaluation did not include specific recommendations for further improvement. (*See id.*). He asserted that he is "doing an excellent job in [the rheumatology] division." (*Id.*).

### G.   Administrative Proceedings and Federal Court Complaint

On May 9, 2007, Dickinson filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"). (Sampson Aff. ¶ 17). He alleged that UMass Memorial discriminated against him by failing to make reasonable accommodations for his learning disabilities and by retaliating against him after he disclosed those disabilities. It alleged four types of retaliatory actions: (1) the denial of additional compensation after he assumed responsibilities in the rheumatology division; (2) the failure to hire him for a Division Manager position; (3) the determination that he was entitled to a 2.5% pay raise instead of a 4% raise, coupled with the poor performance evaluation; and (4) the use of the words "idiot," "foolish," and "stupid" in e-mails, a conversation, and an evaluation. (*See* MCAD Complaint, Def.'s Facts, Ex. 9). MCAD conducted an investigation and determined that there was a lack of probable cause for claims of disability discrimination and retaliation. That decision was affirmed on appeal. Dickinson was issued a right to sue letter on June 3, 2009.

Dickinson's complaint was filed in this Court on September 15, 2009. He is proceeding *pro se*. The complaint asserts that UMass Memorial failed to reasonably accommodate his disabilities and retaliated against him for disclosing the disabilities in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*.

## II. <u>Motion to Strike</u>

Plaintiff has moved to strike three pieces of evidence submitted in support of defendant's motion for summary judgment. Specifically, he asks the Court to strike (1) all evidence relating to the MCAD finding of a lack of probable cause, (2) a portion of the deposition of Elston-Pollock, and (3) the affidavit of Lynda Holmes, a senior accountant who worked with plaintiff at UMass Memorial. As a general matter, only evidence that would be admissible at trial may be

considered in connection with a motion for summary judgment. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990). In addition, affidavits, although not themselves admissible at trial, may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence. *See* Fed. R. Civ. P. 56(c)(4).

Plaintiff first moves to strike MCAD's dismissal of his complaint, the MCAD report explaining its lack of probable cause finding, and the affirmation of the decision on appeal. (*See* Def.'s Mot., Exs. 10, 11). He contends that the MCAD materials have "no factual relevance" and might "confuse" the Court. (Pl.'s Mot. to Strike, at 1). To the extent that plaintiff's challenge to the MCAD documents is grounded in Federal Rules of Evidence 401 and 402, it is mistaken. The First Circuit has repeatedly confirmed the probative value of reports from MCAD and the Equal Opportunity Employment Commission, but has also explained that "their probative force in individual cases varies considerably and is left to the determination of the trial court." *Hilton v. Wyman-Gordon Co.*, 624 F.2d 379, 383 (1st Cir. 1980); *see also Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 26-27 (1st Cir. 2002) (reaffirming the discretion of district courts to determine, on a case-by-case basis, whether reports and investigation materials from the agencies are admissible); *Smith v. Massachusetts Inst. of Tech.*, 877 F.2d 1106, 1112-1113 (1st Cir. 1989) (crediting the "general agreement" in other circuits "that the question of admissibility is one for the discretion of the district court").

To the extend that plaintiff challenges the MCAD documents as unduly confusing under Rule 403, the Court concludes that the probative value of these documents is not substantially outweighed by the risk of confusion of the issues. *See* Fed. R. Evid. 403. The MCAD documents do not contain conclusory statements unsupported by factual specificity. *See Patten*, 300 F.3d at

27.  Nor are they "unaccompanied by any explanation, analysis, or subsidiary findings." *L'Etoile v. New England Finish Sys., Inc.*, 575 F. Supp. 2d 331, 333 (D.N.H. 2008).  Rather, the MCAD documents detail with particularity the factual findings of the investigating commissioner and furnish a thorough explanation for the lack of probable cause determination.  This level of detail and analysis enhances the probative value of the documents and diminishes any risk of confusion of the issues.  *See id.* at 334.  Plaintiff has failed to demonstrate that the MCAD documents, otherwise admissible as relevant evidence, should be struck under Rule 403.[6]

Plaintiff next asks that the Court strike a portion of Elston-Pollock's September 17, 2009 sworn deposition testimony.  (*See* Def.'s Mot., Ex. 6).  This deposition apparently occurred in conjunction with a separate MCAD complaint filed by plaintiff against UMass Memorial.  Although plaintiff's basis for moving to strike the deposition is not entirely clear, he appears to object to the deposition because it was not taken in conjunction with this case.[7]  Sworn deposition testimony may be used to support or oppose a motion for summary judgment regardless of whether the testimony was taken in a prior proceeding.  *See Gulf USA Corp. v. Federal Ins. Co.*, 259 F.3d 1049, 1057 (9th Cir. 2001) (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991)); *Burbank v. Davis*, 227 F. Supp. 2d 176, 178-79 (D. Me. 2002).  As long as the deponent's sworn testimony sets forth specific facts within his personal knowledge, it may be

---

[6] Although plaintiff does not press the argument, the Court notes that, as there is no reason to doubt their trustworthiness, the MCAD documents are not excluded by the hearsay rule.  *See* Fed. R. Evid. 803(8)(C); *Smith v. Massachusetts Inst. of Tech.*, 877 F.2d 1106, 1112-13 (1st Cir. 1989).

[7] Plaintiff's motion states, "this deposition never occurred in this case, therefore, I was never afforded the right to cross examine [Elston-Pollock] and prepare for this witness."  (Pl.'s Mot. to Strike at 2).  Defendant responds that plaintiff's counsel in fact deposed Elston-Pollock extensively in the related MCAD case and that plaintiff was present for the deposition.  Indeed, defendant has submitted evidence that it was plaintiff's counsel who noticed the deposition that plaintiff now seeks to strike.  (*See* Def.'s Opp. to Mot. to Strike, Ex. A).  Plaintiff does not appear to dispute that he and his counsel were present at the deposition.

considered by the Court in a summary judgment motion.  *See Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 18 (1st Cir. 2007).  Here, the challenged testimony relates to the frequency of Elston-Pollock's meetings with plaintiff—a topic that is particularized and within Elston-Pollock's personal knowledge.  The mere fact that it was taken in an earlier, related proceeding is not sufficient justification for striking it.

Finally, plaintiff asks that the Court strike Lynda Holmes's affidavit.  (*See* Def.'s Mot., Ex. 5).  He contends that because Holmes was a senior accountant at UMass Memorial and was not one of his direct supervisors, she is unqualified to comment on his work.  Under Rule 56, an affidavit offered in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Holmes's affidavit clearly meets this standard.  She states that she worked with plaintiff for nearly two years and reviewed his work on numerous occasions.  (*See* Holmes Aff. ¶¶ 3, 4).  She provides concrete examples of her interactions with plaintiff, all of which are relevant and would be admissible at trial.  That she was not his direct supervisor is of no consequence in determining the admissibility of her affidavit.  As her affidavit easily passes muster under Rule 56, it will not be struck.

Because the disputed materials would all be admissible at trial or may otherwise be considered by the Court under Rule 56, plaintiff's motion to strike will be denied.

## III.    Motion for Summary Judgment

### A.    Standard of Review

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

### B. Failure to Accommodate Claim

Under section 102(a) of the ADA, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination is defined, in part, as the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *Id.* § 12112(b)(5)(A). To recover for disability discrimination on a failure to accommodate theory, plaintiff must therefore establish (1) that he has a disability; (2) that he was "qualified" within the meaning of the ADA—that is, with or without reasonable accommodation, he could perform the essential functions of his position; and (3) that despite knowing of plaintiff's disability, defendant

did not provide a reasonable accommodation.  *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 258-60 (1st Cir. 2001).[8]

Plaintiff contends that his attention deficit disorder and dyslexia constitute disabilities within the meaning of the ADA.  *See* 42 U.S.C. § 12102(1).   Defendant does not dispute that plaintiff has put forth sufficient evidence that he had a disability within the meaning of the ADA. The Court will therefore assume that plaintiff has satisfied the first element of the analysis.

The second element that plaintiff must establish is that he is a "qualified individual" within the meaning of the ADA.  A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Some of the essential functions of plaintiff's job included managing subordinate employees; determining the divisions' financial needs; and preparing budgets, compensation plans, revenue forecasts, and financial reports.  Defendant contends that the record is replete with evidence of plaintiff's inability perform these tasks, with or without reasonable accommodations.  Defendant points to, among other evidence, (1) the undisputed record of plaintiff's poor informal and formal performance evaluations from Elston-Pollock, Dr. Nompleggi, and other UMass Memorial employees; (2) the facts revealed in the investigation into plaintiff's treatment of his subordinate employees; (3) Dr. Nompleggi's recommendation that plaintiff not receive any pay raise; and (4) plaintiff's documented struggles with understanding the financial analyses and formulas with which he worked.  In light of all this,

---

[8] The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny does not apply to ADA discrimination claims based on an alleged failure to make reasonable accommodation.  *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 n.3 (1st Cir. 2001); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999).

defendant maintains that there is no dispute that plaintiff was incapable of performing the essential functions of his job.

Plaintiff contends that his record of positive employment evaluations from December 2005 until July 2006 raises a factual dispute as to his capacity to perform the essential functions of the Division Administrator position. He further argues that UMass Memorial's decision to assign him additional responsibilities within the division of rheumatology supports an inference that he was a competent and able employee.

The ADA does not require an employer to hire, promote, or retain an incompetent or unpleasant employee. Here, the weight of the evidence certainly suggests that plaintiff had significant difficulties with the basic duties of a Division Administrator. Nonetheless, plaintiff has presented sufficient evidence to "generate an issue for consideration by a fact finder regarding plaintiff's capacity to perform [his] job." *Calero-Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004). Summary judgment therefore will not be granted on the basis that plaintiff is not a qualified individual.

The third element of the analysis requires plaintiff to establish that material facts remain in dispute as to whether defendant knowingly failed to provide a reasonable accommodation for his disability. It is upon this element that plaintiff's claim falters. It is undisputed that defendant knew of plaintiff's disability and entered into an interactive dialogue with him to determine how to best accommodate his disabilities. Elston-Pollock and Sampson met with plaintiff as soon as he disclosed his learning disabilities and made an immediate accommodation by providing him with an Excel training class. After his disabilities were confirmed, the team met again with plaintiff to discuss Dr. Carl's suggested accommodations. Plaintiff and his supervisors agreed to implement

all of the suggested accommodations, except for the one regarding presentation of information through more than one medium. Plaintiff does not dispute the reasonableness of these accommodations, nor does he suggest that, with the exception of the "weekly meetings" accommodation, they were not fulfilled.

Plaintiff's claim hinges on the contention that, at some point, Elston-Pollock ceased providing him with formal weekly meetings, allegedly contravening the "feedback/guidance on a weekly basis" accommodation.[9] The only evidence of this claim is plaintiff's May 3, 2007 memorandum to Elston-Pollock in which he expressed dissatisfaction with the frequency of the meetings. Defendant has presented evidence that plaintiff met with Elston-Pollock at least on a weekly basis, and often multiple times per day. In addition, Dr. Nompleggi's affidavit asserts that he "met with [plaintiff] on a weekly to go over ongoing tasks in the Division." (Nompleggi Aff. ¶ 6). Plaintiff does not dispute that Elston-Pollock provided him with informal feedback and guidance at least on a weekly basis or that he met with Dr. Nompleggi on a weekly basis.

Viewing all evidence in the light most favorable to the plaintiff, the worst that can be said of defendant's provision of accommodations is that plaintiff did not have formal weekly meetings with Elston-Pollock. But he did have weekly meetings with Dr. Nompleggi, and he obtained informal feedback from Elston-Pollock at least on a weekly basis. In short, there is no dispute that defendant fulfilled the "feedback/guidance on a weekly basis" accommodation. And there no evidence suggesting that defendant failed to provide the other suggested accommodations in accordance with the plan developed with plaintiff.

---

[9] Whether the parties intended this accommodation to be fulfilled through formal meetings or through more frequent informal interactions is not apparent from the record.

As there is no genuine dispute that defendant knew of plaintiff's disabilities and did provide him with reasonable accommodations for those disabilities, defendant is entitled to summary judgment on the failure to accommodate claim.

## C.    Retaliation Claims

The anti-retaliation provision of the ADA proscribes discrimination against an individual "because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  To prevail on a claim of retaliation under the ADA, plaintiff must establish that (1) he engaged in protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action.  *See Calero-Cerezo*, 355 F.3d at 25 (citing *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002)).  "An ADA plaintiff need not succeed on a disability claim to assert a claim for retaliation."  *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir. 2003).

When a plaintiff cannot present direct evidence of retaliation, the analysis is governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  *See Calero-Cerezo*, 355 F.3d at 26.  Under this approach, plaintiff must first establish a *prima facie* case of retaliation.  *See id.*  The burden then shifts to defendant to offer legitimate, non-retaliatory reasons for its employment decision.  *Id.*  If defendant meets this burden, plaintiff must then establish that defendant's reasons are pretext and that the adverse employment action in fact resulted from defendant's retaliatory animus.  *Id.*

### 1.    *Prima Facie* Case

### a.   Protected Conduct

The first element of plaintiff's retaliation claim is clearly satisfied, as he engaged in protected conduct when he revealed his learning disabilities and requested accommodations.  *See Wright*, 352 F.3d at 478 (holding that an employee is engaged in protected activity under the ADA when he requests a reasonable accommodation); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997).

### b.   Adverse Employment Actions

The second element requires plaintiff to furnish evidence that he experienced an adverse employment action.  Plaintiff alleges he was adversely affected when defendant (1) failed to compensate him for the duties he assumed in the rheumatology division; (2) gave him a 2.5% pay raise instead of a 4% raise and a gave him poor performance evaluation; and (3) declined to interview him for and promote him to the Division Manager position during the restructuring.  He also claims that defendant's tolerance of Elston-Pollock's references to him as "stupid," "foolish," and "idiot" created a hostile work environment, which itself constituted a retaliatory adverse employment action.

The First Circuit has explained that "[t]o be adverse, an action must materially change the conditions of plaintiffs' employ."  *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002) (citing *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996) ("Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.")).  Material changes include such actions as "'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other

employees.'" *Id.* (quoting *Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998)); *see also Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005) ("Typically, an adverse employment action involves a discrete change in the terms and conditions of employment (say, a discharge, demotion, or reduction in pay)."). In some circumstances, deprivation of a privilege of employment that an employee had reason to anticipate he would receive may constitute an adverse employment action. *See Blackie*, 75 F.3d at 726.

Under this standard, plaintiff cannot make out a *prima facie* case that defendant's alleged failure to compensate him for his responsibilities in the rheumatology division was an adverse employment action. Defendant's Salary Adjustments policy provides that an employee is entitled to a temporary pay increase when he is assigned the responsibilities of a higher-graded position. (*See* Streeter Aff. ¶ 7, Ex. C). The evidence establishes that plaintiff was not assigned the responsibilities of a higher-graded position when he assumed duties in the rheumatology division. He retained his Division Administrator position and was never assigned the responsibilities of a Senior Division Administrator. The material conditions of his employment never changed; he was merely asked to perform duties that were already part of his job description. As there was no policy entitling plaintiff to any temporary pay increase, he did not experience an adverse employment action when he did not receive a pay increase.

Plaintiff fares better on his contention that his 2.5% pay raise constituted an adverse employment action. Whether he had reason to anticipate a full 4% raise is not clear from the record. If, for example, all the other employees in the division received a 4% pay raise, plaintiff's 2.5% raise could be construed as an adverse action that materially changed the conditions of his employment. Although it is far from clear that the May 2007 evaluation was unwarranted, the

Court will also construe that "needs improvement" performance review as an adverse employment action. Likewise, defendant's decision not to interview plaintiff for the Division Manager position during UMass Memorial's restructuring can be construed as an adverse employment action. The First Circuit has identified a refusal to promote as an example of an employment action that can materially change the conditions of plaintiff's employ. *Gu*, 312 F.3d at 14. To the extent that the decision not to interview plaintiff for the Division Manager position can be seen as a refusal to promote, plaintiff has established a *prima facie* case on this element of the retaliation claim.

The fourth alleged adverse employment action—the alleged name-calling—amounts to a claim that defendant created a hostile work environment after plaintiff requested accommodations for his disabilities. *See Quiles-Quiles v. Henderson*, 439 F.3d 1, 8 (1st Cir. 2006) (explaining that in the disability context, "[t]he adverse employment action requirement may be satisfied by showing the creation of a hostile work environment"); *Noviello*, 398 F.3d at 88-90 (holding that retaliatory hostile work environment claims under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-3(a), are cognizable). Defendant contends that Elston-Pollock's use of the word "foolish" in his performance evaluation, use of the word "stupid" in one e-mail, and use of the word "idiot" in one e-mail to another employee and in one discussion with him created a hostile work environment.

The First Circuit has determined that the framework for evaluating a discrimination-based hostile work environment claim is transferable to allegations of a retaliation-based hostile work environment. *Noviello*, 398 F.3d at 88. Under this analysis, a plaintiff must show that his "workplace [was] permeated with . . . intimidation, ridicule, and insult that was sufficiently severe or pervasive harassment to alter the conditions of . . . his employment and create an abusive

working environment." *Quiles-Quiles*, 439 F.3d at 7 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The harassment must be "objectively and subjectively offensive," such that a reasonable person would find it hostile or abusive and plaintiff himself also perceived it to be so. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). Among the factors relevant to this analysis are the "frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

The four "name-calling" incidents identified by plaintiff plainly do not suffice to establish a *prima facie* case of a harassment so severe or pervasive as to change the conditions of plaintiff's employment. The words "stupid" and "foolish" were used to critique a specific instance of plaintiff's work performance. Elston-Pollock referred to plaintiff as looking "foolish" and "stupid" for e-mailing a member of senior management with an inappropriate question. And he twice called plaintiff an "idiot," one time to his face and another time in an e-mail to a third party that plaintiff did not know about until it was disclosed in discovery. Such comments are a commonplace expression of frustration or anger. While the comments are perhaps less than polite, the anti-discrimination and anti-retaliation laws were not intended to establish a "general civility code" for the workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Noviello*, 398 F.3d at 92. These four incidents "were at best isolated and offhanded" utterances that do not come close to sufficiently severe or pervasive harassment that alters the conditions of the workplace. *Rios-Jimenez v. Principi*, 520 F.3d 31, 43 (1st Cir. 2008). Taken together, they did not create a retaliatory hostile work environment, nor do they constitute an adverse employment action.

To summarize, plaintiff has established a *prima facie* case that he experienced adverse employment actions when he received a 2.5% instead of a 4% pay raise, when his May 2007 performance evaluation indicated that his work "needs improvement," and when defendant declined to interview him for the Division Manager position. He has failed to make out a *prima facie* case that he was subjected to an adverse employment action when he did not receive additional compensation for assuming duties in the rheumatology division. Finally, Elston-Pollock's isolated use of the words "foolish," "stupid," and "idiot" did not create a hostile work environment sufficient to constitute an adverse employment action.

c.    <u>**Causation**</u>

Under the third element of the retaliation claim, plaintiff must furnish evidence of a causal connection between the protected conduct and the adverse employment action. In other words, he must make out a *prima facie* case that his request for accommodations was causally related to the poor performance evaluation, the 2.5% pay raise, and defendant's decision not to interview him for the Division Manager position. Plaintiff has presented evidence that Elston-Pollock called him an "idiot" when he applied to the Division Manager position, within two months of the pay raise decision and the evaluation. Although this is tenuous evidence to establish a causal connection, the threshold at this stage in the analysis is low. It is therefore sufficient to make out a *prima facie* case of retaliation.

2.    <u>**Burden-Shifting Analysis**</u>

The burden now shifts to defendant to articulate legitimate, non-retaliatory reasons for declining to interview plaintiff for or promote him to the position of Division Manager, for giving him a 2.5% instead of a 4% pay raise, and for giving him a negative performance evaluation. *See*

*Calero-Cerezo*, 355 F.3d at 26. As to the decision not to promote plaintiff, defendant offers two rationales. First, defendant maintains that plaintiff was unqualified for the Division Manager role. The job description stated that a Division Manager must have a "[d]emonstrated ability to lead and direct a project team and conduct effective meetings." (Elston-Pollock Aff. ¶ 11, Ex. C). It also required six to ten years of "proven project management . . . experience" and "outstanding interpersonal skills." (*Id.*). Defendant asserts that plaintiff did not possess these attributes. The month before, he had been the subject of an investigation into his management of subordinate employees, wherein the employees felt intimated and threatened by his management style. Dr. Nompleggi testified that members of the gastroenterology division had "lost faith in Mr. Dickinson's ability to support the [d]ivision" around the same time that he applied to manage the division. (Nompleggi Aff. ¶ 13). Lynda Holmes had written Elston-Pollock to express that she was "not real comfortable" with plaintiff assuming additional responsibilities. (Holmes Aff. ¶ 7, Ex. C). Taken together, this evidence establishes that plaintiff was unqualified for the Division Manager position. This alone would be a sufficiently legitimate and non-retaliatory explanation for the decision not to interview or promote plaintiff. Furthermore, defendant has introduced evidence that the person ultimately hired for the Division Manager position was better qualified than plaintiff. (*See* Elston-Pollock Aff. ¶ 15, Ex. E, F). Hiring the most qualified person to a position is also a legitimate and non-retaliatory reason for declining to interview and promote plaintiff. *See Gu*, 312 F.3d at 12 (concluding that the decision to hire someone more qualified than plaintiff is a legitimate rationale).

Plaintiff's record of mediocre performance easily supplies a legitimate, non-retaliatory reason for giving him a 2.5% pay raise in April 2007 and a "needs improvement" performance

rating in May 2007. Defendant has introduced evidence that it utilized the pay increases as a form of performance feedback, with 0% indicating very poor performance and 4% indicating exceptional performance. (*See* Nompleggi Aff., Ex. E). Plaintiff had an undisputed record of tardiness, ineffective management of subordinates, and confusion with financial analyses and spreadsheets, among other weaknesses, from July 2006 until April 2007. His performance struggles were documented and brought to plaintiff's attention both before and after he revealed his learning disabilities and requested accommodations. Defendant asserts that this record of negative performance justified the 2.5% raise, as opposed to a full 4% raise, and that the poor performance review. The Court agrees. Defendant has advanced a legitimate and non-retaliatory explanation for the 2.5% pay raise and the "needs improvement" performance rating.

Because defendant has advanced legitimate, non-retaliatory rationales for its actions, the burden now shifts back to plaintiff to show that these reasons are pretextual and that defendant's decisions were in fact motivated by retaliatory animus. *Calero-Cerezo*, 355 F.3d at 26. Plaintiff has introduced no evidence to meet this burden. There is simply nothing in the record from which the Court could infer that defendant's reasons for its actions were a pretext for an intent to retaliate against him for requesting accommodations. Absent any evidentiary support for or argument as to how plaintiff can meet this burden, there is no genuine dispute as to any material fact. Accordingly, summary judgment must be entered for defendant on the retaliation claims.

## IV.  **Conclusion**

For the foregoing reasons, plaintiff's motion to strike is DENIED and defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: March 24, 2011                      United States District Judge